**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.

**AUDREY KANE**,

     Plaintiff,

v.

**QUORUM HEALTH RESOURCES, LLC**, a Delaware corporation, and

**PROWERS COUNTY HOSPITAL DISTRICT d/b/a PROWERS MEDICAL CENTER,** a

Colorado Health Service District,

     Defendants.

---

### COMPLAINT AND JURY DEMAND

---

Plaintiff Audrey Kane, by and through the undersigned counsel, and states for her

Complaint and Jury Demand as follows:

## I.  INTRODUCTION

1.    This is an action for injunctive, declaratory, and monetary relief arising from the

Defendants' willful and wanton discriminatory and retaliatory termination of the Plaintiff,

Audrey Kane.   Ms. Kane was employed at and provided services to the Prowers Medical Center

in Lamar, Colorado, for 11 years, most recently as the Chief Financial Officer ("CFO").

1

Throughout her employment, Ms. Kane received excellent performance ratings, promotions and raises. In May 2012, a new Chief Executive Officer ("CEO"), Craig Loveless, was hired. CEO Loveless, a male Mormon, expected Kane, a female non-Mormon, to submit to his direction and decisions, without question. Instead, Kane discovered, reported and opposed potential violations of state and federal law. Thereafter, Ms. Kane's employment was terminated for demonstrably pretextual reasons.

## II.   JURISDICTION AND VENUE

2.      Plaintiff's claims are brought pursuant to the False Claims Act's anti-retaliation provision, as amended, 31 U.S.C. § 3730(h), and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). The Court, therefore, has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

3.      This Court has supplemental jurisdiction over Plaintiff's state law claim pursuant to 28 U.S.C. § 1367.

4.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the employment practices and other conduct alleged to be unlawful occurred in this District.

## III.   PARTIES

5.      Plaintiff Audrey Kane is a citizen of the United States and, at all times relevant, was a resident of and domiciled in the State of Colorado.

6.      At all relevant times, Kane was an "employee" of both Defendants within the meaning of Title VII.

2

7.    Prowers County Hospital District d/b/a Prowers Medical Center ("PMC") is a Health Service District formed pursuant to Colorado's Special District Act, C.R.S. § 32-1-101, *et seq.*

8.    PMC operates a community hospital at 401 Kendall Drive, Lamar, Colorado that provides services to the residents of Lamar, Colorado and the surrounding areas (the "Hospital").

9.    In every month since December 2007, PMC has employed at least fifteen (15) full-time employees.

10.    Defendant Quorum Health Resources, LLC ("Quorum") is a Delaware corporation registered to conduct business in the State of Colorado.

11.    In every month since June 2011, Quorum has employed at least fifteen (15) full-time employees.

12.    Defendants are and have been at all times relevant hereto "joint employers" engaged in an industry affecting commerce within the meaning of Title VII.

## ADMINISTRATIVE REMEDIES HAVE BEEN EXHAUSTED

13.    Kane timely filed her Charge of Discrimination Number 541-2019-01839 with the Equal Employment Opportunity Commission ("EEOC") for retaliation and religious and gender discrimination against PMC on or about April 16, 2019, within 300 days of the date of her termination and PMC's last discriminatory act.

14.    Kane was issued a Notice of Right to Sue, dated August 26, 2019, with respect to Charge Number 5541-2019-01839 pursuant to 42 U.S.C. § 2000e-5(f)(1).   Kane timely filed this action within ninety (90) days of receipt of same.

15.    Kane timely filed her Charge of Discrimination Number 541-2019-01845 with the Equal Employment Opportunity Commission ("EEOC") for retaliation and religious and gender discrimination against Quorum on or about April 16, 2019, within 300 days of the date of her termination and Quorum's last discriminatory act.

16.    Kane was issued a Notice of Right to Sue, dated August 21, 2019, with respect to Charge Number 5541-2019-01845 pursuant to 42 U.S.C. § 2000e-5(f)(1).   Kane timely filed this action within ninety (90) days of receipt of same.

17.    All administrative prerequisites have been met prior to filing this action.

## IV. FACTUAL ALLEGATIONS

### PMC and Quorum are Joint Employers

18.    Defendants and their agents and/or employees have at all relevant times hereto acted as a joint employer of Kane.

19.    At all relevant times, Quorum provided administrative and management services to PMC pursuant to an Administrative Services Agreement (hereafter "Administrative Services Agreement").

20.    Under the Administrative Services Agreement, Quorum "employs" PMC's Chief Executive Officer, Craig Loveless, and Chief Financial Officer, Audrey Kane – both of whom performed services at the Hospital, for the benefit of and under the general direction of PMC.

21.    At all relevant times, the Administrative Services Agreement required Quorum to provide PMC with "borrowed employees" to fill work assignments and positions located exclusively in PMC's Hospital.

4

22.     Quorum and PMC both exercised significant control over Audrey Kane, Craig Loveless and any other administrative employees working at the Hospital and employed by Quorum (hereafter "Borrowed Employees").

23.     Quorum and PMC jointly managed and supervised the Borrowed Employees, including co-determining matters of work assignments, day-to-day supervision, employee discipline, and termination of employment.

24.     Pursuant to the Quorum Administrative Services Agreement, Quorum and PMC had the right to jointly:

     a.      direct, control and supervise the Borrowed Employees;

     b.      approve the hiring of Borrowed Employees;

     c.      participate in the annual review and evaluation of the Borrowed Employee's performance;

     d.      terminate the Borrowed Employees;

     e.      establish the Borrowed Employee's work schedule and reporting structure;

     f.      approve the Borrowed Employee's use of vacation time;

     g.      establish compensation for the Borrowed Employees; and

     h.      require the Borrowed Employee to comply with both Defendants' compliance program(s).

25.     Pursuant to the Administrative Services Agreement, Quorum was obligated to report potential noncompliance with PMC's compliance program to the attention of PMC.

26.     Pursuant to the Administrative Services Agreement, PMC was obligated to: 1) reimburse Quorum for the salary or hourly wage of the Borrowed Employee plus a percentage of the Borrowed Employee's salary or hourly wage, and 2) pay for the Borrowed Employee's vacation, severance and sick leave that is accrued and due at the time of termination.   The amounts to be paid by PMC were to be "considered a payroll obligation of the Hospital for purposes of setting priorities for payment of the Hospital's obligation."

27.     The Borrowed Employees were agents for both Defendants.

### Kane's Employment by Defendants

28.     On or about December 12, 2007, PMC hired Kane as its Accounting Manager to perform services at and for the benefit of the Hospital.   In November 2008, she was promoted to Controller.

29.     In June 2011, Kane was hired by Quorum as the Chief Financial Officer at the Hospital to perform services at and for the benefit of the Hospital.   She served in the CFO position until her termination on July 2, 2018.

30.     Throughout her employment with Quorum and PMC, Kane consistently performed well and received satisfactory or above performance evaluations, promotions, raises and bonuses.   It was not until she engaged in activity protected by the False Claims Act and Title VII that she received any negative performance feedback.

31.     Any negative performance feedback provided to Kane is demonstrably pretextual.

32.     Any bases offered for her termination are demonstrably pretextual.

## Discrimination

33.    Throughout the time Plaintiff was employed at the Hospital, her long-term career prospects were stifled by the discriminatory and retaliatory animus of both Defendants and, more particularly, of PMC's Chief Executive Officer, Craig Loveless, a male member of the Church of Latter-Day Saints, also known as a Mormon.

34.    Among other things, the beliefs of the Mormon religion include:

    a.    The submission of wives to their husbands;

    b.    A preference that women are not employed; and

    c.    Loyalty to fellow Mormons.

35.    Throughout the time Loveless was employed at the Hospital, Loveless granted preferential treatment to employees, physicians and outside vendors who are male and/or who were Mormon, often to the detriment of PMC, Quorum and third-party payors including Medicare and Medicaid. In some instances, Loveless' decisions and directives constituted violations of public policy and governing laws.

36.    Loveless expected Kane to comply with his religion's tenets that women were to be submissive to males' directives and not question males' authority.

37.    Loveless expected Kane to comply with his stereotypes of women – that they were to be submissive to males' directives and not question males' authority.

38.    Kane did not comport with Loveless' expectations with regard to religion or gender.

**Religious Discrimination and Hospital Staff**

39.     As set forth below (Paragraphs Nos. 125 through 139), Loveless provided preferential treatment to male Mormon physical therapists including on or about April 27, 2018 when three Mormon physical therapists—Travis Hall, Darren Robbins and Nicholas Durst—employed by PMC, were implicated in over-billing and received bonuses in an amount based on the inflated billing numbers.

40.     In 2018, Gary Peterson, a male, non-Mormon Family Nurse Practitioner employed at the Hospital, had restrictions placed on his professional license. In direct contrast to Loveless' treatment of a similarly situated Mormon, Dr. Tailleur (see Paragraphs Nos. 97 through 108), Loveless ordered the immediate removal of Peterson from the schedule, and Peterson's employment was terminated by Loveless, allegedly because the Hospital could not accept the practice oversight requirements placed on his practice.

41.     During the spring of 2017, Dr. William Lee Denam, a male Emergency Room physician and non-Mormon, was granted emergency privileges by PMC to cover an immediate scheduling need created by Loveless' failure to ensure continuous coverage for PMC's Emergency Room. Upon Loveless' return to work, he was agitated with the use of Dr. Denham and prohibited any continued use of Dr. Denam's services, citing severe deficiencies on his medical license and negative work references.

42.     Plaintiff later found that Dr. Denam had no severe deficiencies on his medical license and only one of three or more work references was negative. The negative reference was from Ken Harman, a fellow Mormon and CEO of Pioneers Medical Center in Meeker, CO.

43.    On numerous occasions after May 2012, Kane reported her concerns regarding Loveless' preferential and inappropriate treatment of Mormon patients, providers and third parties to Constance "Connie" Brase (Board Secretary/Tresurer), William Donatelli (Quorum's President of the Western Division), John Solhiem (Quorum's Regional Vice President), Ken Ward (Quorum's Associate Vice President), and Richard Lewis (Quorum's Associate Vice President)– all of whom acknowledged that Loveless' approach to Kane and male employees of PMC was a typical Mormon male behavioral pattern.

44.    Between 2015 and 2018, Kane had frequent conversations with Quorum's AVPs Lewis and Ward regarding their recognition of Loveless' gender and religious discrimination.

45.    In. July 2017, Quorum Regional Vice President Jim Weidner met with Kane to discuss Kane's concerns about Loveless' gender and religious discrimination, and Weidner assured Kane that the discrimination toward her would cease going forward.

46.    Unfortunately, after July 2017, Loveless' discrimination continued, and he issued a retaliatory draft annual evaluation with unjustified lower performance ratings for Plaintiff.

47.    On or about August 23, 2017, Quorum's AVP Lewis asked CEO Loveless to explain his lower performance ratings for Kane, at which time Loveless stated that Kane's performance had improved year over year, a tacit acknowledgement that any negative performance review was pretextual.

48.    On or about November 30, 2017, Quorum's AVP Lewis brought Kane's concerns regarding ongoing discrimination to the attention of Quorum's President of the Western Division, Donatelli, by email. Quorum's AVP Lewis then informed Quorum's President of the

Eastern Division, Mike Johns, of Kane's gender and religious discrimination concerns in a meeting on or around January 10, 2018 and followed up with Johns in an email on January 11, 2018.

49.    Pres. Donatelli contacted Kane in January 2018 to request an off-site meeting with him and the new Quorum RVP, Solheim, in order to gather additional information. Both Donatelli and Solheim acknowledged that Loveless is a Mormon and that he favors men over women and Mormons over non-Mormons. After acknowledging the overt and pervasive discrimination, Donatelli asked Kane to hang in there and "trust him."

50.    Nearly concurrent with these conversations, in December 2017, Loveless started excluding Plaintiff from meetings relating to hospital expenditures, the revenue cycle, price transparency, and other topics.   As a result of her exclusion from meetings, Plaintiff was unable to efficiently and effectively perform the duties of projects assigned to her, including ensuring compliance.

### Religious Discrimination and Hospital Practices

51.    Loveless also tried to invoke authority over nursing staff to disregard patient safety policies and remove the use of personal protective equipment by staff and visitors after a Mormon patient contracted a highly contagious condition requiring isolation. Kane suggested treatment of the Mormon patient violated the Hospital policy and guidelines from both OSHA and CDC.

52.    Following this Mormon Swing Bed Patient stay (as referenced in Paragraphs Nos. 109 through 120), the Mormon Swing Bed Patient was discharged to out-patient therapy and billed

for 8 to 12 therapy units several times per week.

53.     Non-Mormon patients with diagnoses and patient improvement progress reports similar to the Mormon Swing Bed Patient did not receive such intense therapy services and were frequently referred to nursing homes to receive therapeutic services in a setting with a lower cost of care.

54.     Another non-Mormon swing bed patient, treated within months of the Mormon Swing Bed Patient (again, see Paragraphs Nos. 109 through 120), was closely scrutinized by Loveless and was, subsequently, denied the treatment Loveless provided to the Mormon Swing Bed Patient.

55.     Loveless frequently granted requests for patient account balances to be written off for Mormon patients and/or Mormon friends but denied similar requests made for non-Mormon patients.

56.     A non-Mormon patient who expressed concerns over the quality of care received was told that writing her balance off would be illegal per the Hospital contract with her insurance company. However, during the same timeframe, Loveless was contacted by Mathew Snyder, a Mormon PMC Board of Directors' member, who requested and received a write-off on behalf of a similarly-insured patient.

### Gender Discrimination

57.     In November 2014, Kane announced her pregnancy to Loveless and her due date of April 2015.  Loveless asked if Kane would utilize FMLA and suggested that Plaintiff make her leave a permanent leave, thereby evincing his belief that women should not be working and his desire

to have Plaintiff permanently eliminated from the workforce.

58.     In November 2014, Loveless took a leave of absence for several weeks. During his absence, Loveless directed Kane to act as the backup administrator and oversee a building project managed by The CPI Group ("CPI"), which resulted in numerous change orders and cost overruns. Upon Loveless' return from his medical leave of absence, he and Kane disagreed over the level of detail to be shared with the Board of Directors regarding the cost overruns and complications with the CPI project.

59.     During a December 9, 2014 meeting, Plaintiff complained to Loveless that CPI, acting through its employees, treated Kane and PMC's female employees less favorably than PMC's male employees. CPI employees refused to share necessary project information with Kane and other female employees, excluded Kane and other female employees from briefings and decision making and circumvented Kane and other female employees.

60.     CPI's discriminatory treatment interfered with Plaintiff's ability to perform her job including monitoring the Hospital's finances.

61.     Despite Loveless' acknowledgement of the discrimination, Loveless did nothing to address and eliminate the discriminatory treatment.

62.     During the December 9, 2014 meeting, Loveless also referenced Kane's pregnancy and lectured her regarding her health. When Plaintiff responded by asking if she had lapsed in any of her duties, Loveless replied that Plaintiff had not lapsed, but that she should slow down and not take on so much. Loveless did not offer similar advice to male employees.

63.     In or about July 2015, Kane informed Quorum's AVP Ward that she was being

discriminated against by CPI, that she had informed Loveless of the discrimination and that

Loveless did nothing to address the discrimination. Ward provided guidance to Kane on how to

cope with the discrimination and mental abuse she received from Loveless and The CPI Group.

Ward did not eliminate thereafter discrimination and abuse from CEO Loveless. Discrimination

under CEO Loveless also impacted employee wages and benefits.

64.     In May 2015, when Patrick Laird, a male, was hired as PMC's Chief Clinical Officer, he

was offered a relocation package and vacation days which were far in excess of PMC's standard

package offered to female C Suite employees, including Kane.

65.     Laird, who was similarly situated to Plaintiff, was provided additional benefits, wage

increases and preferential duties which were not offered to Kane.

66.     When Laird was hired, he was hired at a higher compensation level than his female

predecessor, Donna Walker, despite having similar qualifications.

67.     When Laird separated from the CCO position, his female successor, Tina Sandoval, was

hired at a lower compensation level than Laird, despite having similar qualifications.

68.     Other male employees were granted salary increases in excess of the increases paid to

similarly situated women.

69.     On or about August 21, 2015, Kane made a report to Quorum AVP Ward about her

concerns with: 1) CPI's work and the misuse of funds; 2) Loveless' preferential treatment of

Laird; 3) Loveless' discriminatory treatment of his secretary Paula Apple (female and a non-

Mormon) which consisted of Loveless requiring her to buy food and supplies and babysit

Loveless' children and dog while he was on vacation without compensation; and Loveless'

discriminatory treatment of other women.

70.     Ward shared Kane's reports of discrimination with Quorum's Regional Vice President (RVP), Gerald Parton. RVP Parton asked Plaintiff to file a formal complaint through the PMC Compliance Hotline.

71.     On or about August 21, 2015, at the direction of RVP Parton, Kane made a report to PMC's Compliance Hotline about her concerns with Loveless' discriminatory treatment of his secretary Paula Apple (female and a non-Mormon) which consisted of Loveless requiring her to buy food and supplies and babysit Loveless' children and dog while he was on vacation without compensation. In September 2015, Quorum RVP Parton conducted an investigation and informed Kane that his findings confirmed there was a discriminatory environment at the Hospital created by Loveless.

72.     As a result of his investigation, Parton recommended to the Chairperson of PMC's Board of Directors, Julie Branes, that Loveless be terminated.

73.     The Chairperson of PMC's Board of Directors, Branes, did not share Parton's recommendation with other members of PMC's Board of Directors.

74.     Despite Parton's September 2015 investigation and recommendations, Kane saw no evidence that either Quorum or PMC took any corrective action to prevent Loveless from continuing his discriminatory conduct in the workplace.

75.     On December 31, 2015, during a closed-door meeting, Loveless informed Kane that Quorum's RVP Parton disclosed that Kane made an anonymous complaint against him on the Compliance Hotline earlier in the year and expressed extreme anger with Kane, in an obvious act

14

of intimidation and retaliation

76.    On February 24, 2016, at the conclusion of a regular meeting of the Board of Directors of PMC, Board Secretary/Treasurer "Connie" Brase informed Kane that she received a discrimination complaint regarding the conduct of Loveless from two female PMC employees and discussed the complaint with the PMC Chairperson of the Board of Directors, Branes. Brase stated to Kane, that Brase and Branes would not inform the other Board members or further address the discrimination complaint because the two complainants informed Brase they feared further retaliation by Loveless.

77.    Brase further stated to Plaintiff that the decision to refrain from reporting the discrimination complaints was based on the fact that one board member is a Mormon male, and there were concerns that the Mormon board member would share all information with Loveless and, thereby, perpetuate Loveless' discriminatory conduct directed towards non-submissive females.

78.    The Board of Directors, according to the Administrative Services Agreement, are charged with directing, controlling and supervising Borrowed Employees: "The Special Employees shall function at the Hospital as 'borrowed employees,' and shall at all times while serving the Hospital, be under the direction, control, and supervision of the Board." Branes and Brase, by not sharing information about discrimination complaints with the full Board of Directors, prevented the Board from performing this essential function in the PMC-Quorum Agreement.

79.    Brase stated that Mormon men protect each other and offered Kane the opportunity to "vent" to her, but did nothing further to eliminate the discrimination.

80.    In March 2016, PMC's Compliance Manager, Karl Neischburg, and Kane reported to Loveless that employees of PMC's surgery department reported that they were being harassed by Laird because they had questioned the job performance and credentialing of Laird's wife, Christine Laird. Ms. Laird, a Registered Nurse in the surgery department, was paid as a First Assistant, despite her lack of proper credentialing. Loveless refused to investigate or take further action.

81.    On or about March 2016, Kane reported to Quorum's AVP Ward that multiple harassment reports were made from staff members regarding Laird.    Ward directed Kane to report the harassment reports received to Loveless to give the CEO an opportunity to appropriately handle the matter.

82.    On May 25, 2016, Laird met with Plaintiff and Loveless to discuss the rehiring of his wife for the Med/Surg floor. When Plaintiff raised concerns about nepotism and the conflict of interest created by Laird supervising his wife, Loveless and Laird became very angry, yelled at her and, in another clear act of intimidation, threatened to inform staff that Kane objected to hiring Ms. Laird so all the nurses would have to work extra. Prior to this meeting, Loveless and Laird approached numerous departments to try to find a vacancy for Laird's wife and even suggested that one manager change a position description so that Ms. Laird would qualify for the position. Again, Loveless let his loyalty to a male employee, Laird, override his professional duties.

16

**Retaliation for Protected Activity pursuant to False Claim Act
and Wrongful Termination in Violation of Public Policy**

83.     Beginning in 2014, Kane began more closely reviewing Loveless' interactions on behalf of PMC with CPI, an outside design group hired to perform an energy efficiency redesign of PMC and granted a $10 million contract to provide design work for PMC.

84.     CPI's owner ingratiated CPI to Loveless by wining and dining Loveless to ensure that Loveless did not question or scrutinize CPI's work.

85.     While Loveless enjoyed the benefits directed towards him individually, CPI's work at PMC resulted in cost overruns and the depletion of all contingency funds. Based upon his personal interests, Loveless was reluctant to disclose any problems with CPI's performance to PMC's Board of Directors.

86.     The project was funded, in part, by a federal grant from the Colorado Department of Local Affairs.

87.     Throughout the CPI project, Kane, in her role as CFO, insisted that Loveless should disclose CPI's performance problems and cost overruns to PMC's Board of Directors, but Loveless resisted and refused.

88.     Throughout the CPI project, Kane expressed concerns about whether she was able to provide the required periodic reports to the Colorado Department of Local Affairs due to problems and cost overruns and Loveless failures to disclose such information.

89.     Misrepresentations on the periodic reports may represent a violation of federal laws.

90.     Kane began investigating irregularities in CPI's billing which she reasonably believed

could have had Medicare fraud implications.

### Kane's Complains to Defendants that HPCHC's Failure to Revalidate by Medicaid may have resulted in Illegal Medicaid Billing

91.     Most recently, and shortly before Kane's July 2, 2018 termination, she raised concerns about PMC's billing practices, some of which may represent violations of the False Claims Act.

92.     High Plains Community Health Center ("HPCHC") is a health care services provider in Lamar which ordered services from PMC.

93.     In November, 2016, HPCHC hired a new CEO, Eric Niemeyer, a Mormon. Thereafter, Loveless showed favoritism toward HPCHC due to Loveless' religious affiliation with its leader.

94.     In 2017, Medicare denied PMC's request for payments for services ordered by HPCHC's providers, due to HPCHC's failure to complete the Medicare revalidation process required by, among other federal laws, the Affordable Care Act, 42 U.S.C. § 18001 *et seq.* (hereafter "Affordable Care Act") and 42 C.F.R. § 424.15.

95.     Loveless pressured Kane and others to accept HPCHC's orders, despite Kane's specific objection to Loveless that acceptance of the orders may represent a violation of, among other federal laws, the False Claims Act, the Affordable Care Act and 42 C.F.R. § 424.15.

96.     Kane began investigating irregularities in PMC's billing of HPCHC's orders, which she reasonably believed could have had Medicare fraud implications.

**Kane Complained that Male, Mormon Dr. Tailleur's Restricted License and Failure to Revalidate by Medicaid may have resulted in Illegal Medicaid Billing**

97.    In approximately 2013, Dr. Daniel Tailleur, a male Mormon physician with restrictions on his medical license, was recruited and approved by Loveless to work as an Emergency Room Physician at the Hospital.

98.    Loveless implemented no processes to ensure compliance with the restrictions placed on Tailleur's practice and did not disclose the restrictions to PMC, Quorum, or Kane.

99.    In December 2016, the State of Colorado notified Loveless that Dr. Tailleur was not approved for the revalidation of his medical license, a requirement for Medicare billing pursuant to, among other federal laws, the Affordable Care Act and 42 C.F.R. § 424.15. Loveless withheld this information from PMC, Quorum, and Kane and permitted Tailleur to continue providing medical services for PMC and to bill Medicare and Medicaid for such services.

100.    In or around January 2017, Loveless requested and received approval from PMC's Board of Directors to negotiate a new contract, on behalf of PMC, with Tailleur. Loveless did not disclose to PMC's Board of Directors Tailleur's failed revalidation.

101.    On or about January 17, 2017, Loveless received notice from the State of Colorado regarding Tailleur's failed revalidation but did not share such information.

102.    On or about January 20, 2017, Kane first discovered Tailleur's failed revalidation and the restrictions on his license.

103.    In January 2017, Kane notified PMC and Quorum through their representatives—Loveless, AVP Richard Lewis and Compliance Consultant Tomi Hagan—that Tailleur's failed

19

revalidation coupled with PMC's billing of Medicare and/or Medicaid for his services may represent a violation of federal law, including but not limited to the False Claims Act, the Affordable Care Act and 42 C.F.R. § 424.15.

104. On or about January 20, 2017, Quorum's RVP Parton directed that Tailleur no longer be permitted to provide services at the Hospital, for Quorum or for PMC.

105. Despite Parton's direction, Loveless' knowledge of Tailleur's failure to obtain revalidation and Kane's opposition, PMC billed Medicaid and/or Medicare for Dr. Tailleur's services.

106. On January 25, 2017 Kane notified Loveless, Quorum and the PMC Board, that PMC likely improperly billed Medicaid and/or Medicare for Tailleur's services and suggested that an audit be conducted for purposes of determining the amount of charges related to Tailleur's services, which may have been improperly billed, to enable PMC's self-disclosure and minimize liability.

107. Although protocol for audits requires an extensive audit, on or about June 27, 2018, Loveless directed Kane to limit any audit to only three dates of services provided to the Hospital.

108. Kane began investigating PMC's billing of Tailleur's services, which she reasonably believed could have had Medicare fraud implications.

**Kane Complained about Potential Fraudulent Charges for Mormon Swing Bed Patient**

109.     When hospital patients no longer need acute medical care, but are unable to function at home, rural hospitals may offer "swing bed care" for extended care at the hospital in certain circumstances.

110.     The swing bed care services are the same as nursing home care, but take place in the hospital.

111.     To qualify for swing bed care, a patient must meet and continue to meet the Medicare skilled nursing criteria to remain in the hospital.

112.     In the beginning of December 2017, a female, Mormon patient was admitted to the Hospital for swing bed services ("Mormon Swing Bed Patient").

113.     The Mormon Swing Bed Patient remained hospitalized long after the Hospital's services were no longer medically necessary and could have been delivered in a lower-cost setting, in violation of federal law, including but not limited to the Affordable Care Act and 42 C.F.R. §§ 409.30- 409.36.

114.     Throughout and after the Mormon Swing Bed Patient's Hospitalization, Kane reported to Loveless and others that the Hospital's hospitalization and treatment of and Medicare and/or Medicaid billing for the Mormon Swing Bed Patient may have violated federal law (including but not limited to the False Claims Act, the Affordable Care Act and 42 C.F.R. §§ 409.30- 409.36).

115.     Kane began investigating the billing of services for the Mormon Swing Bed Patient, which she reasonably believed could have had Medicare fraud implications.

116.    The Mormon Swing Bed Patient and her treating health professionals whose actions were at issue are all members of Loveless' church.

117.    Loveless knew that the Mormon Swing Bed Patient was eligible to receive therapy services in a lower cost of care setting than the Hospital.

118.    Nonetheless, and in violation of Medicare Conditions of Participation (COPs), Loveless allowed the Mormon Patient's hospitalization, treatment and therapy to continue in the swing bed setting.

119.    Despite having been advised by Kane of the Mormon Swing Bed Patient's care options and the consequences of continuing medically unnecessary care, Loveless allowed the continuation of hospitalization, treatment and therapy and billing of Medicare and/or Medicaid for such services.

120.    The patient was not discharged for several months, well beyond the time she no longer qualified for such services, in or about mid-March 2018.

### Kane Complained about Physician Inducements for Referrals

121.    In 2017, Loveless had PMC sponsor a reward dinner for the surgery department staff including physicians for reaching a certain threshold of surgeries performed in a one-month period.

122.    In 2018, Loveless also offered the full Medical Staff an incentive dinner if they reached a certain volume of patients.

123.    In 2018, Kane notified Loveless, Quorum's AVP Lewis and Quorum's RVP Solheim, that Loveless' reward dinner and incentive dinner may represent illegal inducement for referrals,

22

a violation of federal laws, including but not limited to: the False Claims Act, the Stark Laws, as amended, 42 U.S.C. § 1395nn; 42 C.F.R. § 411.351 and Civil Monetary Penalties provision of the Social Security Act, 42 U.S.C. § 1320a–7a.

124.    Kane began investigating the propriety of Loveless' incentive and reward dinners, which she reasonably believed could have had Medicare fraud implications.

**Kane objected to PT's Over Billings and Resulting Increased Productivity Bonuses**

125.    Beginning in February 2018, Kane repeatedly expressed concerns to Loveless and Quorum regarding whether bills from the physical therapy department ("PT") complied with federal law.

126.    PMC's PT department bills were submitted approximately 60 days after services rendered. The average time for submission of bills in other PMC departments was a mere 11 days. It was this discrepancy, in part, which caused Kane to further review PT billings.

127.    On February 21, 2018, Loveless pulled Kane and HIM Manager Dianna Randel out of a meeting to reprimand Kane for reporting compliance concerns both about the PT department and about Dr. Tailleur's (see Paragraphs Nos. 125 through 139 and Nos. 97 through 108, respectively) billings and revalidation.

128.    Later, on February 21, 2018, Loveless entered Kane's office, closed the door, and, again, in another act of intimidation, reprimanded her for raising compliance concerns relating to the PT department and Tailleur's billings and revalidation. Loveless specifically stated that Kane was not allowed to discuss compliance issues with Quorum.

129.    As a result of her detailed review, Kane learned that PT was billing for undocumented

services and in excess of allowable time-based units.

130.    All three physical therapists in PT are male Mormons and members of Loveless' church.

131.    On or about March 23, 2018, Kane provided documentation as to the details of her PT department's billing review to PMC and Quorum, specifically to Loveless, PMC COO Karen Bryant, RVP Solheim, and PMC's Compliance Manager Nieschburg.

132.    Kane reported that the PT bills to Medicare and/or Medicaid had been inflated. In some instances, billings for some physical therapists' units were three to four times what should have been submitted to Medicare and/or Medicaid.

133.    Because PT employees' bonuses were based, in part, on units billed, the PT department's productivity incentive bonuses, paid on or about April 27, 2018, were similarly inflated.

134.    PMC is a critical access hospital that receives cost-based reimbursement from Centers for Medicare & Medicaid Services ("CMS").  PMC's costs and statistics are reported annually through a cost report, and the hospital is reimbursed based on the reported cost to care for Medicare patients.

135.    Loveless' decisions made to further his interests, at the costs of PMC, increased the cost of providing care to Medicare patients as a result of the costs being passed through to CMS.

136.    In addition to increased expenditures due to Loveless' conduct, the physical therapy department's intentionally inflated billings could have affected the reported payor mix, thereby increasing the amount of reimbursement from CMS.

137.    Kane reported concerns to Loveless that the CMS reimbursement rate may be illegally increased by the improper billings, but Loveless refused to address or remedy the issue.

138. Kane reported to PMC and Quorum that the physical therapy department's improper billing and the resultant reimbursement rate may have violated federal law (including but not limited to the False Claims Act and the Affordable Care Act).

139. Kane began investigating irregularities in PMC's billing of the physical therapy department, which she reasonably believed could have had Medicare fraud implications.

**Adverse Actions**

140. In an obvious act of retaliation, in January 2018, Loveless prepared amendments to PMC's Delegation of Authority policy which, among other things, removed all purchasing authority from Plaintiff's position as CFO. The amendments impacted only Kane's CFO position while maintaining the requirements for the COO and CCO positions. Kane objected to the revisions.

141. On January 3, 2018, Kane complained to Quorum that she was being discriminated against and retaliated by Loveless' decision to take away job responsibilities from her.

142. In February 2018, during a compliance conference call, Loveless became very angry regarding Kane's report relating to a physician who was accepting private payments for patient visits on the PMC campus with PMC staff and supplies. Loveless stated he had no knowledge of the physician's private billing practice. In Kane's later conversations with Loveless, it became clear that Loveless was fully aware of the services being provided by this physician.

143. In March 2018, Loveless told Kane she is not authorized to discuss any compliance matter with anyone one other than the PMC Compliance Officer Neischburg, and specifically stated that she should not speak with PMC's attorney and Quorum representatives.

144.    Kane provided documentation of the discriminatory work environment to AVP Lewis in April 2018, at his request.    Lewis then coordinated a meeting with President of the Western Division Donatelli, Quorum's President of the Eastern Division Johns, RVP Solheim, and himself to discuss the issues. Thereafter, Quorum and PMC neglected to provide a safe and non-discriminatory workplace.

145.    In April 2017, Loveless informed Kane that, due to PMC's growth in net revenue, she would qualify to be moved up to a higher revenue group on the Quorum salary scale, from scale H3 to H4.

146.    During her 2017 annual review, RVP Lewis informed Kane that she was being paid at a step much lower than her experience on the pay scale H3 and that his plan was to ask the Board to approve an increase that would put Kane more in line with her years of experience, rather than asking to move her up to scale H4.

147.    Plaintiff was given an increase; however, she remained being paid at a rate lower than what would have been representative of her experience and performance. In 2018, upon asking Loveless about the pay scale, Kane was told that the net revenue of PMC did not qualify the Borrowed Employees for a higher pay scale.

148.    In April 2018, at the recommendation of Quorum, Loveless was awarded a large salary increase and an adjustment to his pay scale (an increase and adjustment which had been previously denied to Kane) by Quorum and the PMC Board after they were made aware of performance issues and Loveless' discriminatory and retaliatory behavior toward Plaintiff.

149.    In April 2018, Loveless prohibited Kane from attending PMC Board of Governors'

meetings.

150.     After complaining of gender and religious discrimination, Kane was retaliated against by being ignored, excluded from necessary meetings, denied pay increases, demoted, stripped of job duties and authority and, ultimately, terminated from her position.

151.     After complaining about illegal conduct, Kane was retaliated against by being ignored, excluded from necessary meetings, denied pay increases, demoted, stripped of job duties and authority and, ultimately, terminated from her position on July 2, 2018.

**Outside Consultant Conducts Sham Review to Justify Pretextual Termination**

152.     In or about May 2018, Loveless retained Pinnacle Healthcare Consulting ("Pinnacle"), an outside consultant, to conduct a review of PMC's executive and management teams.

153.     Pinnacle conducted a pretextual review, including an overly narrow review of issues which focused on compiling negative information relating to Kane and included only interviews of biased employees and failed to include interviews of necessary employees.

154.     In another act of retaliation, Loveless provided Pinnacle with inaccurate and incomplete information relating to Kane and issues at the Hospital, with the intent of skewing Pinnacle's investigation.

155.     Loveless' predetermined goal of the Pinnacle's review was to compile negative information to justify Kane's termination.

156.     Any report or recommendations issued by Pinnacle to PMC faulting Kane are pretextual.

**PMC and Quorum Terminate Kane on July 2, 2018**

157.    On or about June 27, 2018, PMC's Board of Directors recommended to Quorum that Plaintiff be terminated.

158.    On July 2, 2018, Quorum notified Plaintiff that she was being terminated.

159.    After her termination, Kane's position was filled by a male employee who had not complained about or opposed illegal conduct or Title VII violations.

## V.    STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**(Gender Discrimination in Violation of Title VII against Defendants)**

160.    Plaintiff hereby incorporates the foregoing paragraphs of this Complaint as though fully incorporated herein.

161.    Kane has exhausted her administrative remedies under Title VII of the Civil Rights Act of 1964, as amended.

162.    Kane was discriminated against on the basis of her gender in violation of Title VII with respect to compensation, performance expectations, demotion, exclusion from necessary business opportunities and her ultimate termination.

163.    As a direct and proximate result of Defendants' discrimination, Kane suffered damages.

### SECOND CLAIM FOR RELIEF
**(Religious Discrimination in Violation of Title VII against Defendants)**

164.    Plaintiff hereby incorporates the foregoing paragraphs of this Complaint as though fully incorporated herein.

165.    Kane has exhausted her administrative remedies under Title VII of the Civil Rights Act of 1964, as amended.

166.    Kane was discriminated against on the basis of her religion in violation of Title VII with respect to compensation, performance expectations, demotion, exclusion from necessary business opportunities and her ultimate termination.

167.    As a direct and proximate result of Defendants' discrimination, Kane suffered damages.

**THIRD CLAIM FOR RELIEF**
**(Retaliation in Violation of Title VII against Defendants)**

168.    Plaintiff hereby incorporates the foregoing paragraphs of this Complaint as though fully incorporated herein.

169.    Kane has exhausted her administrative remedies under Title VII of the Civil Rights Act of 1964, as amended.

170.    Kane engaged in protected activity by opposing gender discrimination as set forth above.

171.    Kane was subjected to materially adverse actions, including exclusion from necessary business opportunities, demotion and termination, in retaliation for her opposition to violations of Title VII.

172.    As a direct and proximate result of Defendants' retaliatory actions, Plaintiff suffered damages.

**FOURTH CLAIM FOR RELIEF**
**(Retaliation in Violation of Title VII against Defendants)**

173.    Plaintiff hereby incorporates the foregoing paragraphs of this Complaint as though fully incorporated herein.

174.    Kane has exhausted her administrative remedies under Title VII of the Civil Rights Act of 1964, as amended.

175.    Kane engaged in protected activity by opposing religious discrimination as set forth above.

176.    Kane was subjected to materially adverse actions, including exclusion from necessary business opportunities, demotion and termination, in retaliation for her opposition to violations of Title VII.

177.    As a direct and proximate result of Defendants' retaliatory actions, Plaintiff suffered damages.

## FIFTH CLAIM FOR RELIEF
### (Violations of Anti-Retaliation Provisions of the False Claims Act against Defendants)

178.    Plaintiff hereby incorporates the foregoing paragraphs of this Complaint as though fully incorporated herein.

179.    Plaintiff is an employee or agent of each Defendant pursuant to 31 U.S.C. § 3730(h).

180.    Plaintiff engaged in activity protected by the False Claims Act.

181.    Defendants knew that Plaintiff had engaged in protected activities in furtherance of an action under the False Claims Act.

182.    In retaliation for her protected activity, Plaintiff was subjected to materially adverse actions including but not limited to discharge, demotion and harassment by Defendants.

183.    The retaliation directed towards Plaintiff was because of her protected activity pursuant to the False Claims Act.

184.    As a direct and proximate result of Defendants' retaliatory actions, Plaintiff suffered damages.

## SIXTH CLAIM FOR RELIEF
### (Wrongful Termination in Violation of Public Policy against Defendant Quorum)

185.    Plaintiff hereby incorporates the foregoing paragraphs of this Complaint as though fully incorporated herein.

186.    Defendant Quorum is liable for the acts and/or omissions of its agents and employees.

187.    Defendant either directly or by and through its agents and employees, specifically CEO Loveless, directed Kane during the course of her employment to disregard illegal conduct and/or engage in illegal conduct.   When Kane refused, she was retaliated against.

188.    As set forth above, Kane asserted legal rights.

189.    As set forth above, Kane opposed illegal conduct.

190.    As a result of her assertion of legal rights and/or opposition to illegal conduct, Kane was terminated.

191.    Loveless' conduct/directive to Kane is a direct violation of public policy and a violation of state and federal law.

192.    As a result of Defendant Quorum's actions or inactions, Kane was fired because she refused to disregard illegal conduct and refused to engage in illegal conduct.

193.    Defendant's actions and inactions were intentional and the direct and proximate cause of the damages Kane has suffered.

194.    Kane's discharge was wrongful based on the Defendant's actions and inactions in requesting she commit a crime as part of her employment.

195.    Kane's wrongful discharge by Defendant caused her to suffer injuries, damages, and losses, including but not limited to economic losses and non-economic losses, emotional pain, mental suffering, inconvenience, loss of enjoyment of life, other similar losses to be determined at trial.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants, and award her all relief as allowed by law, including, but not limited to, the following:

a.    Appropriate equitable relief including declaratory and injunctive remedies;

b.    Actual economic damages, including back and front pay, and damages including lost benefits, wages, promotions, tenure, seniority and other employment opportunities as established at trial;

c.    Reinstatement with the same seniority status Kane would have had but for the discrimination;

d.    Compensatory and consequential damages, including, but not limited to, damages for past and future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses;

e.    Punitive and exemplary damages, as allowed by law, in an amount to be determined at trial;

f.    Two time the amount of Plaintiff's back pay pursuant to 29 U.S.C. 3730(h);

g.      Pre-judgment interest from date this action accrued and post-judgment interest at the highest lawful rate;

h.      A tax enhancement, and other equitable relief to make the Plaintiff whole.

i.      Attorneys' fees and costs; and

j.      Such further relief as justice requires.

**PLAINTIFF DEMANDS A JURY TRIAL IN THIS MATTER.**

Respectfully submitted this 18th day of November, 2019.

/s/ Hollie L. Wieland
_____
**Hollie L. Wieland**
Sears & Associates, P.C.
2 N. Cascade Avenue, Suite 1250
Colorado Springs, CO 80903
Phone: (719) 471-1984
Fax: (719) 577-4356
Email: hollie@searsassociates.com
Attorney for Plaintiff Audrey Kane

Plaintiff's Address:
c/o Hollie L. Wieland
Sears & Associates, P.C.
2 N. Cascade Avenue, Suite 1250
Colorado Springs, CO 80903